## AMERICAN ARBITRATION ASSOCIATION

Ann McLaurin, Lynne Fitzgerald,
Claimants,

v.   Case No. 01-18-0001-1064

Respondent Terminix International Co., L.P.,   Arbitrator Eugenia Benedict
Respondent t Terminix International, Inc.,
Ken Stroh,
Respondents.

## ARBITRATOR'S DECISIONS ON MOTIONS TO EXCLUDE DOCUMENTS AND TESTIMONY

During the trial of this case, Respondent Terminix's counsel made numerous objections to Claimants' counsel or co-counsel offering or attempting to offer any evidence of previous cases against their client. Most, if not all, of those objections were sustained at trial. Any other such objections made thereafter are granted herein, and no such verbiage, whether in the form of documents or testimony about previous cases, has been considered. Any mention of the testimony of witnesses who appeared in previous cases and not in the instant one is stricken and any attorney who included such in any post hearing document is warned not to repeat such an error in the future.

## AWARD

I, Hon. Eugenia M. Benedict, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, each represented by counsel, at an evidentiary hearing held on January 22, 2019, through January 25, 2019, do hereby AWARD, as follows:

### FINDINGS OF FACT

Ann McLaurin and Lynne Fitzgerald, hereinafter referred to as Claimants, are retired educators in their seventies. They bought a house located at 204 Grant, Dauphin Island, Alabama, in 2012, for Two hundred thirteen thousand dollars

1

($213,000.00). The previous owner, David Dortch, got a contract with Respondent Terminix for termite prevention on the house in 2011 at a cost of Nine hundred dollars ($ 900.00). The contract was in effect at the time of the sale to the Claimants and was transferred to the new owners soon thereafter.

Before Respondent Terminix enters into a termite protection agreement with a new customer, it promises, in its contract, to do an inspection of the property to ascertain if there are termites present or, even if not, to look for any old damage. After the inspection, Respondent Terminix's employee is to fill out a graph with a diagram of the structure showing what procedures will be performed and where they will be done. Also, there is to be a worksheet showing the calculations of which chemicals will be used and what the quantities will be.

Respondent Terminix's standard contract, including the one with Claimants herein, states that it will perform annual inspections of the customer's structure and either treat and "repair" any damage it discovers or, if the damage is too extensive to repair, that it will "replace" it.

These three documents, the contract with the customer, the diagram of the building showing the procedures planned and the chemical worksheet are to be kept in the customer's file at Respondent Terminix's branch office throughout the term of the contract and for one year thereafter. Retention of these documents is required by the Alabama Department of Agriculture and Industry (hereinafter called the ADAI), the state agency governing the Pest Control industry in Alabama.

Termite prevention treatment is considerably different for a pilings house such as Claimants' than for a house located inland. A house inland generally requires an extensive Post Construction treatment that does not apply in this case. The initial treatment for a house built on pilings is the more limited EP/LI, or Exterior Perimeter/Limited Interior. The requirements are listed on the label of the termiticide and must be followed without deviation. The termite protection plan procedures for a pilings house include at least the following:

    trenching around the back of the structure (not all the way around it) no closer than six inches (6") from the edge of the building and drenching the ground in the trench with the proper amount of chemicals;

    drilling four (4) holes in the concrete slab around the base of each piling and applying the correct amount of chemicals but with the caution of NOT drilling so deeply as to reach the water table only a short distance below;

   if a piling is embedded in a wall or other enclosure, drilling should be done into the piling, if possible, or through the exterior of the encasement if not;

   inspecting any places where wood may be in contact with the soil, installing four inch (4") barriers of concrete between the wood and the soil;

   inspecting the concrete slab sufficiently to discover any cracks and treating such an area with an appropriate amount of chemicals, and

   inspecting the concrete slab sufficiently to discover any seams which would create "cold joints" indicating that areas of the slab had been poured at different times, drilling along the seam and treating the area with an appropriate amount of chemicals.

There were no documents presented at trial that showed that an initial treatment had been done on the property in 2011. The documents pertaining to any initial treatment, which Respondent Terminix is required by state regulations to maintain, were either not available or were blank, i.e. missing the crucial information of planned procedures or calculations of amounts of chemicals to be used.

There were no documents presented at trial that showed that an initial treatment had been done on the property in 2012, 2013, 2014 or 2015, either. Robert Steele, the Respondent Terminix's Mobile service manager of termite claims, testified that Respondent Terminix had previously maintained customer files as a system of paper documents but in recent years the company stored the same information in an electronic form. He stated that when a contract is sold to a new customer that the previously identified documents as well as an assignment sheet noting when and by whom the initial treatment would be done was kept in the company files. When Claimants' co-counsel, Brandon Falls, asked him "So if the information went in about a sale has been completed and treatment is required, that record, whether the treatment was ever done or not, would still exist?", Mr. Steele answered, "If it was performed, yes, sir". Mr. Steele testified that he had looked for the documents related to the initial termite protection treatment and had been unable to find them. Transcript, p. 678.

Dauphin Island is a barrier island in the Gulf of Mexico and the house was built on a prime lot close to the water. Claimants chose this particular house because they are "birders". Birders are people intensely interested in many varieties of birds, their semi-annual migration routes and learning with and from other birders. The location of the Claimants' house is in the actual migration path of many birds and has become a gathering place for the Claimants and many new friends until they

had to vacate it in July, 2017. The loss of community and social interaction has been significant for both women.

Their house is what is known as a pilings house because the main living space is elevated on the pilings and constructed above a concrete slab area below. There are twenty (20) pilings which are actually the house's foundation, not concrete footings, as in a structure built inland. Several of the pilings are enclosed where there are rooms on the ground floor. These rooms include a storeroom, a workroom and a one-half (1/2) bath. The pilings are sunk into the sandy ground at least to a depth equal to the length which protrudes above ground. Such a construction allows water to flow unimpeded across the concrete slab when a storm occurs or when the tide is unusually high.

Claimants' house has a wraparound elevated deck with supporting wooden posts and a wooden handicap ramp. There are no concrete barriers between any of the wooden portions where they are in contact with the ground.

Claimants' house is surrounded by a four (4) foot chain link fence and neither of the Claimants has lived in the house full-time. Claimant Lynne Fitzgerald testified that their Pest Control inspector (whose work was for the elimination of pests other than termites) and who is also an employee of Respondent Terminix, regularly called her to schedule his quarterly appointments. No evidence was presented at trial that Respondent Terminix's termite inspector had ever made appointments for the required annual inspection with either of the Claimants.

Live termites, mud tunnels and significant damage were found in Claimants' home in December of 2016 not by a termite inspector but by Claimants' pest control operator, Will Robinson. He contacted Respondent Terminix who sent out Tim James on December 23, 2016. The spot treatment he did apparently killed any live termites. He also drilled some holes in the concrete slab and may have treated part of the foundation (the pilings) with termiticide. There was no evidence or record of trenching and drenching at the back of the house where the structure is in contact with the soil. There were also no concrete barriers where the wooden supports for the deck and handicap ramp touched the ground. The spot treatment served as an emergency measure for eliminating the live activity but did not comply with those of the apparently skipped initial treatment. No full treatment of the required procedures was performed thereafter, either, but Mr. James did a follow-up in May of 2017.

4

After the December, 2016, spot treatment, Respondent Terminix sent a contractor, Randal Cowart, with R & J Construction, to begin inspection to determine the extent of the damage. Mr. Cowart brought no tools for sounding or probing. He did not examine the attic, remove any sections of wall from the enclosed portion of the house or ceiling on the ground level where the concrete slab is. He did not mention whether he examined the slab to determine if there were cracks or cold joints in the concrete. His inspection was primarily visual.

Mr. Cowart estimated that the repair could be accomplished for about Twenty-five thousand dollars ($ 25,000.00). Respondent Terminix approved that amount and a repair permit was obtained for that sum.

In early May, 2017, some five (5) months after live termites had been discovered, Mr. Cowart and his crew began making isolated repairs of approximately eighteen to twenty-four inch (18" x 24") portions. There repairs were being made where a small section of the wall had been removed and very extensive termite damage had been found. He did not have authority from Respondent Terminix to open up or remove large sections of wall to determine where the damage might end in an area. Mr. Cowart hired Holon Engineering and Construction Company which advised removing interior walls to determine the extent of damage but Respondent Terminix did not take their advice.

During this early stage of repair when Mr. Cowart's crew was beginning work on Claimants' house, his assistant, Manzo, last name unrecorded, found the following:
　　there were too few drill holes in the slab around the pilings to have met the minimum requirements of an initial EP/LI treatment;
　　termite mud was visible in some of the pilings;
　　portions of the pilings had damage near their base in the concrete slab;
　　the plywood forming the ceiling above the slab had termite mud on it, indicating that termites had traveled at least that far and that the plywood would obscure any suspected damage to the joists under it;
　　a washroom on the ground floor had significant termite damage in the walls;
　　a bedroom in the elevated portion of the house had significant termite damage in the wooden structure above the window, in the walls and throughout the floor which felt "soft" when walked on;
　　a bathroom adjacent to the affected bedroom had a "soft", non-stable floor;
　　the header above the sliding glass door onto the deck was riddled with termite damage;
　　there was no barrier material between where wood touched soil at the base of the deck supports or where the ramp began, and

5

a cold joint was found in the slab but no drill holes were seen along it.

Mr. Cowart, upon learning of the more extensive amount of repair required, sought approval from Respondent Terminix which authorized additional amounts of approximately Forty thousand dollars ($40,000.00) for a total of about Sixty-five thousand dollars ($65,000.00).

Corey Moore, the Dauphin Island Building Inspector, visited the Claimants' property and inspected it while R & J Construction's crew was present in May, 2017. Mr. Moore found unacceptable repairs were being done such as portions of damaged wood and original foam insulation had been left in place and repairs installed around or on top of them. The work did not meet the present building Code for Dauphin Island. He found a previously installed wooden diagonal reinforcement that had been eaten away by termites in the ground level wall. He inspected the areas which Manzo had seen, described above, and advised that walls would have to be exposed and the plywood ceiling would have to be removed to determine the extent of damage. He concluded, based on what was visible, that the house was damaged to more than fifty percent (50%) of its value and would have to be taken down. He testified that he called Mr. Cowart and said, "I suspect that what happened here is a result of errors and omissions from Terminix…and by FEMA (Federal Emergency Management Agency) standards you will have to tear down this house". Transcript, p. 1120.

He also advised that a more stringent Code would be in effect by the time the present house was removed and that any house rebuilt thereafter would have to meet the requirements of the new Code.

Lynne Fitzgerald was present for at least portions of the repair work and voiced her displeasure with the workmanship and the pace of the project. When she asked Manzi to show her a copy of the scope (of repair), he said "…they have never given me a copy of the scope". Transcript, p, 1114. When Tom Campbell asked her how that had affected her, she answered, "I was fit to be tied, and I started making calls to Robert (Steele) and Randy (Cowart). She continued, " I just felt the job was not a quality workmanship…they never would have done an extension, or whatever you call it, had I not just stood there and said it's not acceptable. I want a meeting". Transcript, p. 1115. Randy's son and business partner, Josh Cowart, began removing the plywood ceiling above the slab and pulled out the insulation. When he saw the joists so damaged that they were sagging, he said "…all of the joists (are) going to have to be replaced, that they needed to replace all the walls up to a non-damaged area and then…y'all are going to have to move out of your

6

house ". <u>Transcript</u>, p. 1116. Lynne Fitzgerald said she "…was stunned". <u>Transcript</u>, p. 1116.

Lynne Fitzgerald conferred with an architect, William Phillips, and asked him if he would rebuild the house. He said "…the percentage of it is over 50 percent, and I wouldn't rebuild it for me". <u>Transcript</u>, 570.

Respondent Terminix did not inform Claimants that the initial treatment had never been done, that annual inspections were not performed, that the "spot treatment" completed in 2016 was not compliant with their contract, or that sub-standard repairs were being done from 2016 until all repairs ceased.

Ms. Fitzgerald, who lived in the house more than did Claimant Ann McDonald, had to vacate her home in July, 2017 and move into a travel trailer that she and Ms. McDonald own. At the time of trial in late January, 2019, Ms. Fitzgerald was seventy-five years old and had been out of her home for a year and a half.

The Claimants' retained the services of William Campbell who filed a complaint for them with the ADAI and, later, filed suit in 2017.

Ms. Fitzgerald testified that during the period following discovery of the damage to her house, that she had suffered three different episodes of heart malfunction known as Atrial Fibrillation. She said she had been taken to a hospital by ambulance where she remained for several days and was dependent on medications for her condition thereafter. She reported having had difficult reactions to the medications. She had the third episode in December, 2018, just weeks before the trial of this case.

Robert Skolnik, the national manager of termite claims for Respondent Terminix, visited the Claimants' house after they had filed their claim with the ADAI but before they filed suit. He had not read the Claimants' file kept at Respondent Terminix's branch office or learned that no record therein showed that an initial treatment was ever done. He did not inspect the graph to see what procedures were to have been done initially or the chemical calculation worksheet which was blank. He did not search Respondent Terminix's own files to see if annual inspections had been done or, if they had, if the inside of the house had ever been inspected. He came without tools for probing or sounding to inspect what he had been told was a badly damaged house and did not request that a repairman remove any portion of a wall for examination. He did a walk-through inspection but did not offer to "replace" the house. Shortly after Mr. Skolnick's inspection, Respondent

7

Terminix's top officials, the CEO and CFO, authorized Ken Stroh to offer the Claimants a cash settlement of Seventy-two thousand dollars ($72,000.00) as a total settlement package, including a release of all liability and silence about their experience, rather than agree to replace their home. The Claimants' contract with Respondent Terminix does not state an option for the company to offer a cash settlement rather than replace the house if it is unrepairable. The letter offering the cash settlement did not contain any suggestion of possible negotiation.

In arriving at a figure to offer the Claimants for their unrepairable house, Mr. Skolnick testified that he had not:
    consulted a property appraiser to determine the property's market value both before and after the termite damage;
    consulted a contractor to determine the estimated cost of rebuilding and doing so to the stricter Code about to go into effect;
    had not learned the cost the Claimants had paid for the house or
    looked beyond the Mobile County tax records to determine the actual market value of the property.

The Claimants had paid Two hundred thirteen thousand dollars ($213,000.00) for their prime waterfront lot and house in 2012 and had the structure insured for One hundred forty thousand dollars ($140,000.00) but Mr. Skolnick never asked them for that information.

The Claimants did not respond to the offer or to telephone messages from the Respondent Terminix's branch manager, Ken Stroh; they just filed suit.

Claimants allege that:
    Respondent Terminix did not perform the required EP/LI initial termite protection treatment in 2011 or at any time thereafter and did not inform them of that fact;
    Respondent Terminix did not perform the required annual termite inspections both inside and outside the Claimants' house in 2012-2016 and did not inform them of that fact;
    Respondent Terminix's contract promised to "repair or replace" damaged property when it did not intend to perform what was promised;
    Respondent Terminix collected annual renewal fees for five (5) years while defrauding the Claimants;
    Respondent Terminix intentionally refused to determine the extent of damage to Claimants' house and made inadequate and ineffective repairs that could not suffice to protect it in predictable storms;

8

Respondent Terminix, through its national termite claims manager, Richard Skolnick, willfully and intentionally refused to get an evaluation of the true pre-damage market value of their house;

Respondent Terminix, through its national termite claims manager, Richard Skolnick, who deals with resolving termite claims nationwide, knew or should have known that a tax record does not indicate the actual market value of a house;

Respondent Terminix, through its national termite claims manager, Richard Skolnick, willfully and intentionally refused to obtain even an estimate of the actual cost that it would take to rebuild the Claimants' home;

Respondent Terminix, through its national termite claims manager, Richard Skolnick, and its senior officials, willfully and intentionally offered the two elderly female Claimants an unreasonably small sum as a final settlement with no intention for the amount to be sufficient for them to rebuild their home;

Respondent Terminix, through its national termite claims manager, Richard Skolnick, left the task of rebuilding their home to Claimants when the parties' contract had promised to "replace" an unrepairable structure;

By failing and then refusing to provide proper termite protection treatment, as required by the parties' contract, in an area known as a Formosan termite hotbed, Respondent Terminix acted with willful and intentional malice resulting in the foreseeable destruction of Claimants' home;

By Respondent Terminix's inactions as well as its malfeasance, Claimants have suffered considerable foreseeable mental anguish, and

Respondent Terminix committed continuous intentional deception amounting to Fraud and is, therefore, liable for all damages suffered by Claimants.

## DISCUSSION

### I

David Dortch, the previous owner of the house at issue in this case, did not have termite protection but obtained it in 2011 as a requirement of selling the house to the Claimants. He contracted with Respondent Terminix and the contract was transferred to the Claimants after they bought the house in 2012. The contract stated that the Respondent Terminix would make an inspection of the house, treat it with procedures appropriate for its particular construction, do annual inspections and retreat it if active termites were found, the initial barrier of treatment had been disturbed or landscaping had compromised the barrier of protection. It stated further that it would repair damage found under any of those conditions or replace the structure if it could not be adequately repaired.

9

Respondent Terminix did not have records showing that the initial inspection had been done in 2011, that the initial termite protection treatment had been performed in 2011 or at any other time before 2016, what procedures were to have been performed or the amounts of chemicals to have been applied. All of those records are required by the ADAI Regulations to be kept in Respondent Terminix's customer file for the Claimants throughout their contract period. The conclusion can only be that no treatment was done from 2011 until a spot treatment of active termites was done in 2016.

Claimants relied on the belief that Respondent Terminix would fulfill their obligation to treat and protect their house and such reliance was to their detriment. See Transcript p. 1089.

## II.

At all times relevant to this matter, Respondent Terminix knew it had not performed the initial inspection or treatment for which it had contracted with Mr. Dortch or thereafter with the Claimants. It knew that annual inspections of the entire structure were not done over a five year period and it did not disclose any of that information to the Claimants. See Transcript, p. 1092.

It knew that the location of the house was in a precarious area because of Formosan activity and highly foreseeable damage if proper treatment and maintenance thereof were not followed. In spite of such knowledge, Respondent Terminix continuously failed and refused to supply the necessary treatments to protect Claimant's house from destruction.

## III.

When termite damage was discovered in 2016, Respondent Terminix would not initially authorize either the contractor or the engineer they hired to do the necessary work to determine the extent of damage. Only small areas of a wall were removed, inspectors arrived at the house without tools to do a proper inspection and what repair was undertaken was done in a manner that did not comply with the current building Code for Dauphin Island.

## IV.

There was no evidence or testimony presented at trial that Respondent Ken Stroh had acted independently or beyond the scope of his employment as branch manager of Respondent Terminix's Mobile branch office

## CONCLUSIONS OF LAW

The Pest Control industry is strictly regulated for at least two reasons. One is because the chemicals used are so dangerous and the other is that the general public knows virtually nothing about the chemicals used or what the results might be if mishandled. The public must be able to rely, through trust, on the superior knowledge of the professionals trained for work in the industry. The label for the termiticide provides exact instructions on how the chemical is to be used and no variation is permitted for the professional using it. The directions are not advisory; violation of them is a Misdemeanor in Alabama.

Federal laws require pest control companies to follow the label instructions of the poisonous chemicals they use. 7 U.S.C.A. Section 136 et seq.

The Alabama Legislature established the ADAI in the 1930's to make and adopt Regulations "...to carry out the intent and purpose of this chapter and to regulate persons engaged in professional services (of providing pest control) or work defined in this chapter to prevent fraudulent and unauthorized practices of those professional services or work...". Section 2-28-3, Code of Ala. (1975). These Regulations mandate the types of treatments companies can sell and what specific treatment mechanics must be performed. ALA. ADMIN. CODE 80-10-9.01 et seq. (2009). Also, the department has broad authority to sanction, fine and even suspend the licenses of an operator who fails to comply with the Regulations. Code of Ala. Section 2-28-3, (1975) requires termite companies and licensed employees under whom they operate to post a bond to assure a high quality of workmanship.

Since the service provided to the Claimants is regulated by the state, contracts Respondent Terminix issues for termite protection incorporate the minimum standards provided by the laws as matter of contract construction. <u>Watson v. Water Works Bd. of the City of Birmingham</u>, 480 So.2d 1190, 1193 (Ala. 1985).

Also, Respondent Terminix has a common law duty to disclose to its customers all material facts known to it but not to the customer which might be detrimental to the latter. Respondent Terminix did not disclose their failure to treat and the Claimants were deceived about the validity of the service that had been sold to them, relied on Respondent Terminix's assertion that they were protected and were harmed.

11

## II.

Fraud is defined in the Code of Alabama, Section 6-5-101 et seq. (1975) as follows:
"…misrepresentation of material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitutes legal fraud". The evidence and testimony developed at trial clearly showed that Respondent Terminix knew it had not provided the services in its contract with the Claimants and each renewal period thereafter when the promised were renewed.

Code of Alabama, Section 6-5-102 (1975) states that "…suppression of a material fact which the party is under an obligation to communicate constitutes fraud".

Fraud consists of some deceitful practice or willful device, resorted to with intent to deprive another of his right, or in some manner to do him an injury. See 23 Am. Jur., Fraud and Deceit, Section 20, p. 773; 37 C.J.S., Fraud, Section 19, p. 254 and (c) Section 21, p. "In the sense of a court of equity, (Fraud) properly includes all acts, omissions, and concealments which involve a breach of legal or equitable duty, trust, or confidence justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another. 1 Story, Eq. Jur. §187; Howard v. West Jersey & S.S. R. Co., 102 N.J. Eq. 517, 141 A. 755, 757; in accord, Black's Law Dictionary, 2nd ed., p. 789.

Respondent Terminix had an obligation to keep the Claimants informed of all material facts about their termite prevention services at their home but chose not to do so. The obligation arises under the terms of their contract, state law and at common law. Lucas v. Hodges, 589 So.2d 154, 158 (Ala. 1991).

From Respondent Terminix's own records, the fact that documents were missing although required to be maintained by Alabama law, and testimony at trial, it is obvious that Respondent Terminix failed to perform consistently with the parties' contract, did not inform the Claimants of their failure and did not adequately and honestly correct the damage caused by their failure. Their conduct was fraudulent and they are, therefore, responsible for damages to the Claimants.

## III.

The Termidor label allows for spot treatments to be made under certain circumstances IF a thorough initial treatment had been done before. However, in this case, Terminix performed only spot treatments at the Claimants' home yet not

12

only had not done the required EP/LI treatment at first but, in fact, NEVER did it. Such is a direct violation of the label requirements and the State ADAI Regulations. The fact that an insufficient "spot treatment" method was used after no initial treatment was performed leads to the conclusion that Respondent Terminix was cheating its customers. It is obvious that Respondent Terminix was the party with superior knowledge here, knew damage was occurring and that the Claimants home was being destroyed but did not take corrective action proves more than Negligence; it is callousness to a malicious degree.

In this case, Respondent Terminix has ignored the Regulations governing its business, the laws of Alabama, and the terms and spirit of its contract with the Claimants. Therefore, Respondent Terminix is solely responsible for the full damage suffered by the Claimants.

## IV.

Respondent Terminix is one of the largest pest control companies in the world. It knows what its responsibilities are to its industry, the states and countries in which it does business and, most importantly, to its customers.

A company commits Promissory Fraud when it knows or should know what is required of it to perform legally in a state yet knowingly fails to do so and has no intention of performing the treatment required by the State's Regulations. In this case, Respondent Terminex's inaction of required behavior in a strictly regulated industry is equivalent to *scienter* sufficient to support the Claimants' allegation of Fraud.

Furthermore, in a coastal area such as Dauphin Island, AL, the site of the property in issue, the company knew that Formosan termite activity was widespread and very destructive especially if proper precautionary treatments were not taken. The company promised a treatment which it did not provide and, apparently, had no intention of providing or they would not have done merely a "spot treatment". When fraud is the chosen direction of a company's "service" to its trusting customers and it tries to limit its responsibility for the damage it causes, it is reprehensible. Respondent Terminix's intention and actions here were to undertreat what their contract offered and withhold that information from the Claimants. Such fraud makes Respondent Terminix liable for all damages in this case.

## V.

As there was no evidence that Respondent Ken Stroh acted independently outside

his scope of employment with Respondent Terminix, any and all claims against him personally are hereby dismissed.

## DAMAGES

**Claimants' home**

The retirement home of Claimants, both single women in their seventies, has been destroyed by termites. Why did this happen? The evidence is clear that although they had a contract with Respondent Terminix to protect their home from termites, known to flourish in their area, Respondent Terminix negligently, willfully and wantonly failed and then continuously refused to perform the Alabama Defined Termite Protection Plan their contract promised. Since the contract had been purchased by David Dortch shortly before he sold the house to Claimants, perhaps, at first, there was simply a mishap and oversight in Respondent Terminix's failure to treat immediately. However, there was no reasonable excuse offered for Respondent Terminix to fail to provide the crucial treatment after the first annual inspection in 2012. There was no evidence presented that an inspector came in 2012 or thereafter and inspected the interior of the house. If one had come and inspected thoroughly, he would have seen that there were not the appropriate number of drill holes around the pilings in the slab. He would have seen that a cold joint in the slab had not been drilled and that wooden supports for the deck and for the handicap ramp were touching the ground without the requisite concrete bases to obstruct termite traffic.

It is important to note that the house has a four foot (4') chain link fence surrounding it but Lynne Fitzgerald, who was in residence much of the time and always reachable by telephone, could and would have made entrance possible had she been notified by the termite inspector. She had such an arrangement with Will Robinson, the Claimants' pest control inspector, who came quarterly and had no trouble making contact with Ms. Fitzgerald. Mr. Robinson was also an employee of Respondent Terminix.

According to Corey Moore, the Dauphin Island Building Inspector, and Chris Annello, the Claimants' construction expert witness, the costs of demolishing the house and rebuilding it would probably be approximately $250,000.00. Respondent Terminix will be responsible because of the "repair" or "replace" portion of their contract with Claimants which they have violated.

## Cost of relocation

Because of Respondent Terminix's bad faith, willful and wanton failure and then refusal to protect Claimants' home, it is so damaged that it has to be demolished. Since July 7, 2017, they have not been able to live in it and have had to find somewhere else to be. Ann McDonald has another house in Daphne, AL and both ladies have been there some of the time. However, Lynne Fitzgerald has spent most of her nights in the ladies' travel van parked in state or local parks. That is cramped and expensive for her and would not have been necessary but for Respondent Terminix's actions. The costs of the relocation of her "residence", and both Claimants' furniture and all household goods, moving back into the house when it is rebuilt and all associated costs thereof, will be charged to Respondent Terminix.

## Mental anguish

The mental anguish of these elderly ladies, through no fault of their own, and undergoing all the stress of the damage done to them as well as to their home by Respondent Terminix late in their lives, is hard to measure. All of the anguish not only could have been prevented but should have been. Respondent Terminix knows how to prevent termite damage to a home they contract to protect by treating it according to the law and Regulations governing their profession. They know how to inspect for possible damage and to treat it if it is found. They know how to tell a customer the truth if they discover that a treatment has not been done correctly and to rectify the oversight but they did not do any of that in this case.

Therefore, Respondent Terminix is responsible for the considerable mental anguish which these ladies have undergone and will continue to suffer as they take on the responsibility of building a new home, a task Respondent Terminix had promised to shoulder if replacing their house became necessary.

## Incidental/Consequential Damage

Under Bates v. General Steel Tank Co., 36 Ala.App. 261, 264, 55 So.2d 213, 215 (Ala.App. 1951), it is obvious that Terminix is liable for all injuries and damage foreseeable as a result of its negligent acts. However, in this case, the evidence is overwhelming that Terminix was guilty of years of intentional fraud and, therefore, "...there is 'extended liability' for intentional torts". Phillips v. Smalley Maintenance Services, Inc., 435 So.2d 705, 712 (Ala. 1983).

15

## Punitive Damages

In Alabama, punitive damages are warranted when a defendant "consciously or deliberately engaged in oppression, fraud, wantonness or malice with regard to the plaintiff". Ala. Code Section 6-11-20(a) (1975). Respondent Terminix deserves punitive damages for the following reasons:
1. Respondent Terminix's failing or refusal to perform the required actions of the initial treatment of the Claimants' home;
2. its wanton failure and refusal to conduct appropriate annual inspections;
3. its refusal to retreat properly even when termite activity was found;
4. its bad faith refusal to determine the extent of damage that had to be repaired;
5. its refusal to determine an accurate market value of the Claimants' pre-damaged property before making an offer of a cash settlement;
6. its offering a cash settlement rather than its obligation to "repair" or "replace" without authority from the parties' contract to do so, and
7. its hiding the truth from the Claimants for over five (5) years justifies the imposition of punitive damages.

## Attorney's Fees

Although the United States borrowed our body of law, called the common law, from England when this country was established, we did not adopt the English method of handling attorney's fees. Reynolds v. First Alabama Bank of Montgomery, 471 So.2d 1238, 1241 (Ala. 1985). The "American Rule" is that each party bears his own costs of representation but "…the rule is usually expressed with exceptions encouched therein. One of the main exclusions is the equitable exception". Reynolds, at 1242. In Hall v. Cole, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed. 2d 702 (1973), the Court explained in no uncertain terms that the rule may be overridden if the equities justify it.

As stated in 6 J. Moore, Federal Practice, paragraph 54.77[2], p. 1709 (2d ed. 1972), a federal court may award counsel fees to a successful party when his opponent has acted "in bad faith, vexatiously, wantonly or for oppressive reasons. In this class of cases, the underlying reason of "fee shifting" is, of course, punitive and the essential element in triggering an award of attorney's fees is the existence of "bad faith" on the part of the unsuccessful party. See also Mills v. Electric Auto-Lite Co., 396 U.S. 375, 391-392 [90 S.Ct. 616, 625-626, 24 L. Ed.2d 593] (1970).

"The power to award such fees (attorney's fees) 'is part of the original authority of the chancellor to do equity in a particular situation'." Sprague v. Ticonic National Bank, 307 U.S. 161, 166 [59 S. Ct. 777, 780, 83 L.Ed. 1184] (1939). A similar holding in Coupounas v. Morad, 380 So.2d 800, 803 (Ala. 1980) is that "…in Alabama, a court of equity is authorized to mold its decree so as to adjust the equities of the parties and meet the necessities of each situation". "The obvious conclusion is that Alabama recognizes exceptions to the American Rule where fraud, willful negligence or malice has been practiced". Reynolds, supra at 1243.

In this case where Respondent Terminix has been accused of committing multiple acts of Fraud over a term of five (5) years, the home under contract has to be demolished because of termite damage and the evidence supports the allegations, an award of attorney's fees is appropriate.

### Whether Attorney's Fees and Expenses are "Reasonable"

Factors to be considered as guides in determining the reasonableness of a fee include the following: (1) the nature and value of the subject matter of the employment; (2) the learning, skill and labor requisite to handling the matter; (3) the time consumed; (4) the professional experience, reputation of the lawyer or lawyers performing the services; (5) the weight of the attorneys' responsibilities; (6) the amount involved and the results obtained; (7) the reasonable expenses incurred; (8) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (9) the fee customarily charged in the locality for similar legal services; (10) the time limitations imposed by the client or by the circumstances; (11) the nature and length of the professional relationship with the client; (12) whether the fee is fixed or contingent. Peebles v. Miley, 439 So. 2d 137 (Ala. 1983). See also *Model Code of Professional Responsibility*, DR 2-106(B) (1982).

Although Respondent Terminix's counsel contends that Peebles applies only to common fund cases, that is not a requirement of the ABA's *Model Code of Professional Responsibility*, DR 2-106(B) (1982).

As regards factors One through Four, above:, Claimants' chief counsel, Thomas Campbell, has obviously prepared thoroughly to obtain considerable knowledge of his specialty, termite pest control cases, over a period of many years. He is due to be compensated to some degree but the time he and his practice have spent on this particular case is not totally clear.

17

Considering factors Five and Six, above: Mr. Campbell's law practice is primarily, if not exclusively, involved with Plaintiff's claims against the Pest Control profession. As many of his cases are tried in Arbitration, the amounts he has won for his clients are not public information. However, he cannot have continued without recovering significant judgments for his clients. As he has a contingency fee with the Claimants, his responsibilities are considerable since if he is not successful for them, neither he nor they are compensated at all.

Considering factors Seven through Eleven: Determining whether an attorneys' expenses are reasonable is complicated. In Mr. Campbell's case, he has, by his own declaration, built a vast amount of information from and/or about the pest control defendants against whom he has tried cases over the span of his career. Obviously, he does not need to start from scratch with discovery when he takes on a new case. He also does not need to search for expert witnesses anew with each case as he often uses the same persons for their expert opinions.

He employs six litigators and several support staff persons but not all are working on any one case at the same time.. Therefore, it is crucial to determine from the Expenses spreadsheet he submitted if all expenses are exclusively from this case. It appears that the expenses are for or from this case but some are questionable, such as expenses for experts, and some are not specific enough. The time constraints in this case are a factor since at least Lynne Fitzgerald is out of her home and in frail health. Mr. Campbell has represented these clients since the Fall of 2017 and the trial was not held until January, 2019.

It makes sense for an attorney who takes a case on a contingent fee basis to charge more than an attorney who is guaranteed compensation by periodic billings. Mr. Campbell's fee arrangement with the Claimants is a 45% contingent fee. During his representation of the Claimants in this case, he has had no compensation for his work or expenses in this matter. However, even with all the precarious factors being considered, any fee must be reasonable in relation to the amount awarded.

The American Bar Association in its *Model Code of Professional Responsibility,* DR 2-106(B) (1982), stated "a fee is clearly excessive when after review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee." As the amount of the recovery increases, the attorney's fee should be prudently reduced.

**THEREFORE, all relevant factors having been considered, the arbitrator makes the award shown below:**

## Itemization of Damages

Incidental
    Termite Services Paid

| | | |
|---|---|---:|
|         2012-2014 @ $225.00 annually | $ | 675.00 |
|         2015-2017 @ $241.00 annually | $ | 723.00 |

Compensatory

| | | |
|---|---|---:|
|    Demolition and Rebuilding house | $ | 275,000.00 |

(Amount increased over estimates because building costs are likely to rise over time necessary for reconstruction)

| | | |
|---|---|---:|
|    Investigation of damage (Architect) | $ | 600.00 |
|    Utilities (Unusable House) | | |
|     Power | $ | 2,000.00 |
|     Water | $ | 880.00 |
|     Property Tax | $ | Unknown |
|    Yard maintenance $65.00/mo. (20 mos.) | $ | 300.00 |
|    Campground lot rental (8 mos. 2017-2018) | $ | 3,434.00 |
|    Campground lot, if necessary, (2019-2020) | $ | 6,000.00 |
|    Robert Davis (Repairs on house, early 2017) | $ | 300.00 |
|    Automobile gas (after house condemned) | $ | 3,633.00 |
|    Auto wear/tear to meet with repairmen | $ | 6,000.00 |
|    Trash service for 3 mos. @ $125/mo. | $ | 375.00 |
|    Storage unit, two (2) yrs. @ $ 1,290/yr. | $ | 2,580.00 |
|    Re-landscaping after reconstruction | $ | 400.00 |
| | | |
| Incidental and Compensatory Damages Subtotal | $ | <u>302,900.00</u> |

Mental Anguish
    Lynne Fitzgerald                                                       $      900,000.00

| | | |
|---|---|---|
| Ann McDonald | $ | 300,000.00 |
| **Grand Total Compensatory:** | $ | 1,502,900.00 |
| **Punitive Damages:** | $ | 750,000.00 |
| **TOTAL PAYABLE TO CLAIMANTS** | $ | 2,252,900.00 |
| Claimants' Attorney Fees due from Respondent | $ | 500,000.00 |
| Claimants' Attorney Expenses due from Respondent | $ | 15,000.00 |
| **TOTAL PAYABLE TO CLAIMANTS' ATTORNEY FROM RESPONDENT** | $ | 515,000.00 |

The administrative fees of the American Arbitration Association (AAA) totaling $2,400.00 and the expenses and compensation of the arbitrator totaling $10,000.00 shall be borne as incurred.

All payments are due to be paid within thirty (30) days of the execution of this Order.

This Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

So ordered this 14th day August, 2019.

*Eugenia Benedict*

Eugenia Benedict, Arbitrator

20